**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X
EXTREME REACH, INC.,

             Plaintiff,

  -against-

PGREF I 1633 BROADWAY LAND, L.P.,
1633 BROADWAY OWNER I, LP, and
1633 BROADWAY OWNER II, LP,

             Defendants.

------------------------------------------------------- X

22-CV-_____

**COMPLAINT**

Plaintiff Extreme Reach, Inc. ("ERI"), by and through its undersigned attorneys, alleges as follows for this Complaint, which seeks declaratory and other relief against Defendants PGREF I 1633 Broadway Land, L.P., 1633 Broadway Owner I, LP, and 1633 Broadway Owner II, LP (collectively, "Landlord"):

## NATURE OF THE ACTION

1. This case is about Landlord's bad faith rejection of ERI's election to pay more than $7,500,000 to exercise an express early termination right under a commercial lease dated December 23, 2011 (the "Lease"). Landlord's bad faith is so palpable that, despite repeated requests, its own counsel has never been able to articulate a good faith basis for his client's rejection of the termination. Instead, Landlord and its counsel have made clear that their true aim is extort an even higher termination payment from ERI.

2. The relevant facts are not disputed. Pursuant to the Lease, ERI is the tenant for the entire fifth and sixth floors of Landlord's building at 1633 Broadway in Manhattan. A true and correct copy of the Lease is annexed as **Exhibit A**.

3. The term of the Lease runs until 2028, but Article 34 of the Lease expressly provides Tenant with a one-time option to terminate the Lease as of October 14, 2023 by providing notice of its election to terminate 15 months prior to October 14, 2023 – *i.e.*, by July 14, 2022 – and making a substantial termination payment (the "Termination Notice" and "Termination Payment," respectively).

4. Beginning at least as early as March 2022, ERI notified Landlord of its intention to terminate the Lease early pursuant to Article 34. Landlord confirmed the early termination date and the Termination Payment amount of $7,532,543.93.

5. On July 12, 2022, ERI sent the Termination Notice to Landlord by hand, email, and certified mail. A copy of the Termination Notice is annexed as **Exhibit B**. ERI asked Landlord to confirm receipt of the Termination Notice and provide wire instructions for the Termination Payment. However, Landlord ignored ERI's requests. Accordingly, by July 14, ERI paid Landlord $7,532,543.93 via Automated Clearing House ("ACH").

6. Much to ERI's surprise, on July 20, 2022, Landlord's counsel, Howard Kingsley of Rosenberg & Estis, P.C., sent a letter to ERI purporting to reject the Termination Notice. Kingsley asserted that ERI's termination "failed to comply with the terms of the Lease." A copy of Kingsley's July 20, 2022 letter is annexed as **Exhibit C**.

7. Over the next several weeks, ERI, through its counsel, repeatedly asked Kingsley to articulate how ERI "failed to comply with the terms of the Lease." However, Kingsley was unable to do so.

8. Kingsley's inability to articulate any way in which ERI "failed to comply with the terms of Lease" is not surprising, because ERI complied with the Lease when it sent the Termination Notice and made the Termination Payment. Nevertheless, Landlord continues to

insist that the Termination Notice is invalid and that it can hold ERI hostage to the Lease through 2028.

9. Accordingly, ERI brings this action for a declaration that it properly terminated the Lease. ERI also seeks attorneys' fees due to Landlord's outrageous bad faith.

10. Because of the urgency of this matter, the absence of any factual disputes, and ERI's need to know as soon as possible whether it will be bound to the Lease through 2028 so that it can make appropriate business arrangements one way or the other, ERI has simultaneously moved for a speedy hearing pursuant to Fed. R. Civ. P. 57.

## THE PARTIES

11. Plaintiff Extreme Reach, Inc. is a Delaware corporation with a principal place of business in Dedham, Massachusetts.

12. Upon information and belief, defendant PGREF I 1633 Broadway Land, L.P. is a Delaware limited partnership with a principal place of business in New York, New York, whose partners are citizens of New York and New Jersey.

13. Upon information and belief, defendant 1633 Broadway Owner I, LP is a Delaware limited partnership with a principal place of business in New York, New York, whose partners are citizens of New York and New Jersey.

14. Upon information and belief, defendant 1633 Broadway Owner II, LP is a Delaware limited partnership with a principal place of business in New York, New York, whose partners are citizens of New York and New Jersey.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because plaintiff and defendants are citizens of different states and the amount in controversy in this matter exceeds $75,000.

16.     This Court has personal jurisdiction over defendants because they have their principal place of business in this District, this action arises out of transactions that took place in this District, and because defendants expressly submitted to the jurisdiction of this Court in Article 11.01(b) of the Lease.

17.     Venue is proper in this Court because this action arises out of transactions that took place in this District, and Article 11.01(b) of the Lease contains a forum selection clause choosing the state and federal courts of New York County.

**THE LEASE**

18.     The Lease is for the entire fifth and sixth floors of Landlord's building at 1633 Broadway in Manhattan.

19.     Pursuant to a Consent to Assignment dated April 2, 2015, ERI became the tenant under the Lease.

20.     On June 8, 2020, the three defendant limited partnerships notified ERI that, pursuant to an assignment, they were now the landlord under the Lease as tenants in common.

21.     ERI subleases the 5th floor of 1633 Broadway to The Clinton Foundation, pursuant to a sublease approved by Landlord.

22.     Section 1.02 of the Lease provides that the term of the Lease shall be 15 years and 10 months from the Term Commencement Date. It is undisputed that the end date for the term of the Lease, if not terminated early, is April 14, 2028.

23. The fixed rent payable under the Lease is set forth in Section 1.04. For the first four years and two months of the term, the annual rent was $4,737,535. For the next five years, the annual rent was $5,168,220. For the final five years of the Lease, the rent was $5,598,905.

## **THE EARLY TERMINATION OPTION IN ARTICLE 34 OF THE LEASE**

24. Article 34 of the Lease is titled, "Tenant's Option to Terminate."

25. Section 34.01(a) of Article 34 provides, in full:

> (a) Tenant may elect on a one time basis only, at Tenant's option, to irrevocably terminate this Lease, and the term and estate hereby granted as of the date (Surrender Date) occurring on the day which is the eleven (11) year and four (4) month anniversary of the Term Commencement Date provided that Tenant shall give to Landlord written notice (Termination Notice) not less than fifteen (15) months prior to the Surrender Date of Tenant's election to so terminate this Lease (time being of the essence with respect to the giving of such notice) and concurrently with the giving of such notice, Tenant shall make to Landlord a payment (Termination Payment) in an amount equal to the amount of the Applicable Percentage, as hereinafter defined, of the sum of (a) the aggregate cost of Landlord's Work, (b) any and all leasing commissions or brokerage fees incurred by Landlord on account of this Lease or the negotiation thereof, and (c) the amount of Fixed Rent which is abated for a period of eleven (11) months pursuant to Section 1.10 hereof plus the amount of $55.00 per rentable square foot of the Premises per annum calculated for the period of time between the date this Lease is fully executed and delivered between the parties and the Term Commencement Date (i.e., the period of time for Landlord's Work). For purposes of calculating the Termination Payment, there shall be applied to the amounts set forth in clauses (a), (b), and (c) of this Section 34.01 an annual interest factor at eight percent (8%) per annum, and the Applicable Percentage shall mean a fraction, expressed as a percentage, the numerator of which shall be the number of months remaining in the term of this Lease as of the Surrender Date and the denominator of which shall be 190.

26. Section 34.01(b) of Article 34 provides, in full:

> (b)    In the event of the giving of such Termination Notice and the making of the Termination Payment, this Lease and the term and estate hereby granted (unless the same shall have expired sooner pursuant to any of the conditions of limitation or other

5

provisions of this Lease or pursuant to law) shall terminate on the Surrender Date with the same effect as if such date were the date hereinbefore specified for the expiration of the term of this Lease, and the Fixed Rent and other charges payable hereunder (other than the Termination Payment) shall be apportioned as of the Surrender Date.

27. Section 34.01(c) of Article 34 provides, in full:

(c) In the event Tenant does not send the Termination Notice to Landlord on or before the date set forth in Section 34.01(a) hereof, then this Article 34 shall be deemed null and void and deleted from this Lease.

28. Thus, pursuant to the express terms of the Lease, ERI could terminate the Lease as of October 14, 2023 by providing the Termination Notice and making the Termination Payment on or before July 14, 2022.

**ERI SENDS THE TERMINATION NOTICE AND TERMINATION PAYMENT**

29. By early 2022, ERI alerted Landlord that it was considering exercising its early termination option under Article 34.

30. To that end, on March 3, 2022, Mark Weiss, a broker acting on behalf of ERI, emailed Douglas Neye, Landlord's Vice President, and Peter Brindley, Landlord's Executive Vice President and Head of Real Estate, and asked that they provide a calculation for the Termination Payment pursuant to Section 34.01(a) of the Lease.

31. Neye responded the next day, March 4, 2022, with Landlord's calculation of the Termination Payment in the amount of $7,532,543.93. A true and correct copy of Weiss's email exchange with Neye and Brindley is annexed as **Exhibit D**.

32. A few days later, on March 8, 2022, Neye sent another email to Weiss in which he confirmed that the early termination date would be October 14, 2023. A true and correct copy of Neye's March 8, 2022 email is annexed as **Exhibit E**.

6

33. On July 8, 2022, as the deadline for ERI to exercise the early termination right drew near, Neye forwarded his calculation of the Termination Payment to Weiss. A true and correct copy of Neye's July 8, 2022 email is annexed as **Exhibit F**.

34. On July 12, 2022, at 12:20 p.m., Jorge Martell, ERI's Chief Financial Officer, sent an email to Brindley and Bernard Marasco, Landlord's Senior Vice President & Counsel, attaching the Termination Notice. A true and correct copy of Martell's email is annexed as **Exhibit G**.

35. In his email, Martell stated:

> Hi Peter, Bernard,
>
> Please find attached the early termination notice for our 1633 Broadway lease. We will follow up with payment of the early termination fee tomorrow. Can you please confirm your wiring instructions.
>
> We will be hand delivering and mailing (certified mail) this notice as well.
>
> Please confirm receipt of this email and if you could please confirm your bank wiring instructions that would be great.
>
> Let me know any questions.
>
> Thank you,
>
> Jorge

36. On July 12, 2022, ERI also transmitted the Termination Notice to Brindley by Certified Mail Return Receipt Requested. A true and correct copy of the Certified Mail Receipt is annexed as **Exhibit H**.

37. ERI also transmitted the Termination Notice to Landlord by hand on July 12, 2022, as confirmed by ERI's office manager, Stephanie Scott, who reported in an email that

afternoon that the Termination Notice "was delivered at 1:03 pm." A true and correct copy of Scott's July 12, 2022 email is annexed as **Exhibit I**.

38. The Termination Notice that ERI provided to Landlord by email, hand, and certified mail, stated:

> Pursuant to previous discussions, and Section 34.01 of the Lease, Extreme Reach, Inc. hereby exercises its option to terminate the Lease, with a Surrender Date of October 15, 2023. Upon your confirmation, we will also wire the Termination Payment ($7,532.543.93).

*See* **Exhibit B**.

39. The next day, July 13, 2022, Weiss forwarded the Termination Notice to Neye and asked him to confirm receipt. A true and correct copy of Weiss's July 13, 2022 email is annexed as **Exhibit J**.

40. Despite the requests in the emails from Martell and Weiss, and the request in the Termination Notice itself, nobody on behalf of Landlord responded to confirm receipt of the Termination Notice or provide wire instructions for the Termination Payment.

41. On July 13, 2022, Martell followed up with Landlord several times in an effort to confirm Landlord's receipt of the Termination Notice and to obtain wire information to complete the Termination Payment.

42. First, at 12:19 p.m. on July 13, 2022, Martell emailed Brindley and Marasco and stated:

> Peter, Bernard,
>
> Can you please confirm receipt of this termination notice? It was hand delivered yesterday at 1:03 pm ET in your offices and email[ed] to you.
>
> Can you please provide the wire instructions to make this termination payment, and a contact to confirm the wiring details?

> Look forward to hearing from you at your earliest convenience.
>
> Thanks,
>
> Jorge

A true and correct copy of Martell's July 13, 2022, 12:19 p.m. email is annexed as **Exhibit K**.

43. Next, at 2:33 p.m. on July 13, 2022, Martell emailed David Lieberman, Landlord's Property Manager for 1633 Broadway, and stated:

> Hi David,
>
> I am the CFO at Extreme Reach, your tenant on the 6th floor. I was hoping you could provide me with Paramount's bank details to send a wire transfer for a payment we want to make today.
>
> Look forward to hearing from you.
>
> Thanks,
>
> Jorge

A true and correct copy of Martell's July 13, 2022, 2:33 p.m. email is annexed as **Exhibit L**.

44. Then, at 2:43 p.m. on July 13, 2022, Martell emailed Katilin Killian, Landlord's Senior Property Associate, and stated:

> Hi Kaitlin,
>
> I hope all is well. I am the CFO at Extreme Reach, your tenant on the 6th floor.
>
> Are you able to provide us with your bank wiring detail information? We would like to send a wire payment today.
>
> Looking forward to hearing from you.
>
> Thanks,
>
> Jorge

A true and correct copy of Martell's July 13, 2022, 2:43 p.m. email is annexed as **Exhibit M**.

45. None of Neye, Brindley, Marasco, Lieberman, or Killian responded to Martell's July 13, 2022 emails.

46. Despite Landlord's failure to provide wire instructions, ERI made alternate arrangements to make the Termination Payment, and proceeded to pay the Termination Payment to Landlord by ACH.

47. At 7:47 p.m. on July 13, 2022, ERI sent $7,500,000 to Landlord by ACH, which Landlord received by the next morning, July 14, 2022. A true and correct copy of the ACH transaction report is annexed as **Exhibit N**.

48. At 11:43 a.m. on July 14, 2022, ERI sent $32,543.93 to Landlord by ACH, which Landlord received that day. A true and correct copy of the ACH transaction report is annexed as **Exhibit O**.

49. On July 14, 2022, Martell sent an email to all four of Brindley, Marasco, Lieberman, and Killian.

50. Martell's email stated:

> Paramount team,
>
> I am **very** disappointed by the lack of response to my emails and acknowledgement of the early termination notices (via email, hand-delivered, and certified mailed).
>
> Nonetheless, we have sent electronic payment for the early termination fee. As such, you have been provided written notice and gotten paid for our early termination fee, and therefore our obligations to early terminate this lease were completed timely. We will plan on exit[ing] this lease by the required date.
>
> Thanks,
> Jorge

A true and correct copy of Martell's July 14, 2022 email is annexed as **Exhibit P** (emphasis in original).

10

51. Thus, by the contractually-stipulated deadline of July 14, 2022 to exercise its right to terminate the Lease early, ERI had provided the Termination Notice and made the Termination Payment.

## **LANDLORD PURPORTS TO REJECT THE TERMINATION NOTICE**

52. To ERI's surprise, on July 20, 2022, it received a letter from Landlord's counsel, Howard Kingsley of Rosenberg & Estis, P.C., purporting to reject the Termination Notice and returning the Termination Payment.

53. Kingsley's letter stated, in full:

> My law firm represents Landlord. I have been asked to respond to your July 11, 2022 letter which states "Extreme Reach, Inc. hereby exercises its option to terminate the Lease, with a Surrender Date of October 15, 2023. Upon your confirmation, we will also wire the Termination Payment ($7,532,543.93)" (the "Purported Notice"). Such wire was sent days after the Purported Notice.
>
> Landlord hereby rejects the Purported Notice and by the enclosed check (no. 003112) made payable to Tenant, returns Tenant's payment in the amount of $7,532,543.93 because Tenant's attempt to terminate the Lease prior to the Lease's expiration date of April 14, 2028 (the "Expiration Date") failed to comply with the terms of the Lease.
>
> Based upon the foregoing, (a) the Purported Notice is null and void, and has no force and effect, (b) the Lease remains in full force and effect through the Expiration Date, and (c) Landlord expects Tenant to fully comply with the terms of the Lease through the Expiration Date.
>
> Should Tenant breach the Lease by, for example, abandoning and vacating the Premises on or before the Expiration Date, Landlord will take all actions it deems appropriate.
>
> This is without prejudice to all of Landlord's claims, rights and remedies under the Lease and law, all of which are expressly reserved.

Kingsley enclosed with his letter a check payable to ERI in the amount of the Termination Payment. *See* **Exhibit C**.

11

54. On July 28, 2022, ERI's counsel responded to Kingsley's letter and stated, among other things, that Landlord "has not identified any way in which Tenant's notice or exercise of its termination right was deficient." The letter stated in full:

> We write on behalf of Tenant in response to your July 20, 2022 letter. Landlord's purported rejection of Tenant's exercise of its right to terminate the Lease is baseless. Tenant properly exercised its termination right, and Landlord has not identified any way in which Tenant's notice or exercise of the termination was deficient. Accordingly, enclosed is Landlord's check purporting to return the termination fee.
>
> Tenant expects that Landlord will comply with its obligations for the remainder of Tenant's tenancy, and will not interfere with the orderly termination of the Lease or Tenant's surrender of its tenancy in October 2023.

ERI returned Landlord's check with its July 28, 2022 letter. A true and correct copy of ERI's July 28, 2022 letter is annexed as **Exhibit Q**.

55. On July 28, 2022, Kingsley responded by email but still failed to identify any way in which ERI's exercise of its termination right was deficient. Instead, Kingsley stated, "We hereby reject your attached letter and, again, the check will be returned should you nevertheless be inclined to play ping pong with it." A true and correct copy of Kingsley's July 28, 2022 email is annexed as **Exhibit R**.

56. Kingsley also sent a letter to ERI dated July 29, 2022 and returned the check yet again. In his letter, Kingsley still failed to identify any way in which ERI's exercise of its termination right was deficient. Instead, notwithstanding his inability to explain how ERI's termination was deficient, Kingsley chided ERI and its counsel for their purported "childishness," stating:

> In furtherance of my e-mail that I sent to you yesterday, I am returning to you Landlord's enclosed check (no. 56-503), in the amount of $7,532,543.93, made payable to Tenant since Tenant insists on playing a childish game of ping pong.

12

> This is without prejudice to all of Landlord's claims, rights and remedies under the Lease and law, all of which are expressly reserved.

A true and correct copy of Kingsley's July 29, 2022 letter is annexed as **Exhibit S**.

57. On August 8, 2022, counsel for ERI responded to Kingsley's letter. ERI *again* noted that Landlord had not identified any deficiencies in its exercise of the termination right, and *again* asked Kingsley and/or Landlord to provide details supporting their position. ERI's August 8, 2022 letter stated in full:

> We write on behalf of Tenant in response to your July 29, 2022 letter. While you insist on characterizing Tenant's position as "childish," Tenant properly exercised its early termination rights under the Lease. Despite your several letters and emails, you have yet to identify any way in which Tenant's exercise of its early termination right was defective. Should you wish to provide more details, Tenant will be happy to evaluate Landlord's position, though we remain confident that Tenant's exercise was proper. Until then, Tenant continues to expect that Landlord will comply with its obligations for the remainder of Tenant's tenancy, and will not interfere with the orderly termination of the Lease or Tenant's surrender of its tenancy in October 2023.

A true and correct copy of ERI's August 8, 2022 letter is annexed as **Exhibit T**.

58. On August 9, 2022, Kingsley responded by email, stating in full:

> This is in response to your August 8th letter. Any capitalized terms not defined herein have the meanings ascribed to them in my July 20 letter.
>
> I do not find it productive to "litigate" by letter, especially when Tenant has taken the hard line position of "remain[ing] confident that [its] exercise was proper" without expressing any interest in attempting to resolve the matter.
>
> Moreover, your statement that "Tenant continues to expect[] that Landlord…will not interfere with the orderly termination of the Lease or Tenant's surrender of its tenancy in October 2023" is surprising because Landlord has already rejected Tenant's attempt to terminate the Lease and will not accept any early surrender.

> This is without prejudice to all of Landlord's claims, rights and remedies under the Lease and law, all of which are expressly reserved.

A true and correct copy of Kingsley's August 9, 2022 email is annexed as **Exhibit U**.

59. Kingsley's August 9, 2022 email revealed Landlord's true intention to try to extort a higher termination fee from ERI, by asserting that Tenant had not "express[ed] any interest in attempting to resolve the matter."

60. In fact, there was nothing "to resolve." Either the termination was proper or it was not under the terms of the Lease. The parties could not "resolve" through a negotiation what was a pure factual question under the terms of the Lease. However, neither Landlord nor Kingsley had identified any way in which ERI's exercise of its termination right was improper.

61. To that end, on August 11, 2022, ERI's counsel responded to Kingsley and again sought Landlord's position as to why ERI's exercise of its termination right was purportedly improper. ERI's counsel wrote:

> Despite our request, you still have not provided a basis for Landlord's purported rejection of the notice of termination, so it is not clear what Landlord believes we should be "attempting to resolve." We have no intention of litigating by letter, and will instead do so in Court if Landlord cannot articulate a reason for its rejection that merits further discussion.

A true and correct copy of the August 11, 2022 email is annexed as **Exhibit V**.

62. On August 15, 2022, Kingsley left a message for ERI's counsel and requested a return call. When ERI's counsel called Kingsley, Kingsley stated that he was going on vacation and would provide a further response the following week. Kingsley stated during that call that his response would include Landlord's explanation as to why ERI's exercise of its termination right was improper.

63. ERI's counsel responded and asked Kingsley if he would explain Landlord's position over the phone during that call. Kingsley responded, "No."

64. Despite his representation that he would provide a substantive explanation of Landlord's position "next week," by August 29, 2022, Kingsley still had not responded to ERI's August 11, 2022 email.

65. On August 29, 2022, ERI's counsel wrote to Kingsley and stated:

> Howard,
>
> Despite your assurances of a substantive response, we did not receive anything from you last week. It is our hope that your client has reviewed this matter further and reconsidered its baseless objection to the notice of termination. Please advise as to your client's position so that we can put this matter to rest.
>
> Thank you

A true and correct copy of the August 29, 2022 email is annexed as **Exhibit W**.

66. Kingsley responded by email on August 30, 2022. However, despite the numerous times that ERI had asked for an explanation of Landlord's objection to the Termination Notice, and despite Kingsley's promise during the August 15, 2022 phone call that an explanation would be forthcoming, his email provided no details. Instead, Kingsley wrote: "The parties obviously disagree. To us, it is crystal clear that the tenant did not comply with the lease." A true and correct copy of Kingsley's August 30, 2022 email is annexed as **Exhibit X**.

67. Curiously, despite it being "crystal clear" to Kingsley and Landlord that ERI "did not comply with the lease," they never were able to explain how that was so.

68. In fact, ERI provided the Termination Notice and made the Termination Payment in compliance with the Lease.

69. Landlord's contrary and unsupported position – which neither it nor its counsel can bring themselves to articulate – is the product of manifest bad faith.

15

## COUNT I
### (Declaring ERI's Termination of the Lease Valid)

70. ERI repeats and re-alleges each and every allegation contained in paragraphs 1 through 69 of the Complaint, as if fully set forth herein.

71. Section 34.01 of the Lease provides that ERI may terminate the Lease early by providing the Termination Notice and making the Termination Payment not less than 15 months prior to the Surrender Date of October 14, 2023, *i.e.*, by July 14, 2022.

72. ERI provided the Termination Notice and made the Termination Payment by July 14, 2022.

73. Despite the foregoing, Landlord has taken the position that ERI's termination of the Lease is invalid.

74. There is an actual and justiciable controversy because Landlord continues to assert that ERI's termination of the Lease is invalid, and that ERI is bound to the Lease through April 2028.

75. Accordingly, ERI requests a declaration that the its termination of the Lease was valid and that the Lease will terminate as of October 14, 2023.

## COUNT II
### (Breach of the Lease)

76. ERI repeats and realleges each and every allegation contained in paragraphs 1 through 75 of the Complaint, as if fully set forth herein.

77. Landlord's position that ERI's termination of the Lease was improper or defective is frivolous and contrary to the Lease and the covenant of good faith and fair dealing.

78. Indeed, Landlord's position is so frivolous that Landlord has never been able to explain the basis for its position, despite repeated requests.

79. No party acting in good faith could possibly take the position Landlord has taken with respect to ERI's termination of the Lease.

80. Landlord's conduct is in bad faith, and is vexatious, wanton, oppressive, and designed to harass ERI.

81. Further, by its conduct, Landlord left ERI with no choice but to bring this action, thereby unnecessarily and improperly burdening the Court, in addition to burdening ERI with unnecessary attorneys' fees.

82. Accordingly, the Court should enter an order awarding ERI its attorneys' fees incurred in responding to Landlord's breach of the Lease, and its bad faith position, which required ERI to bring this otherwise unnecessary action.

**WHEREFORE**, Plaintiff ERI respectfully requests that this Court:

1. Declare that ERI properly terminated the Lease, with an effective surrender date of October 14, 2023;

2. Award ERI its attorneys' fees; and

3. Award ERI such other relief as the Court may deem just and proper.

Dated:  September 16, 2022

Respectfully submitted,

SEYFARTH SHAW LLP

By:  */s/ Jeremy A. Cohen*
    Jeremy A. Cohen (JC-6602)
    Claire A. Bjerke (SDNY admission pending)
    Seyfarth Shaw LLP
    jacohen@seyfarth.com
    cbjerke@seyfarth.com
    620 Eighth Avenue
    New York, New York  10018
    Telephone: (212) 218-5500
    Facsimile:  (212) 218-5526

*Attorneys for Plaintiff Extreme Reach, Inc.*